First Division

June 8, 1998 

No. 1-96-2907

LEWIS X. COHEN INSURANCE TRUST ) Appeal from the

and HAROLD B. COHEN TRUST, ) Circuit Court

 ) of Cook County.

Plaintiffs-Appellees and ) 

Cross-Appellants, )

 )

v. )

 )

JEROME H. STERN and MERIT )

FINANCIAL CORPORATION, ) Honorable

 ) WILLARD J. LASSERS,

Defendants-Appellants and ) Judge Presiding.

Cross-Appellees. )

PRESIDING JUSTICE BUCKLEY delivered the opinion of the court:

Plaintiffs the Lewis X. Cohen Insurance Trust and the Harold B. Cohen Trust brought an action against defendants Merit Financial Corporation (Merit) and Jerome H. Stern (Stern) alleging breach of a stock purchase agreement (Agreement).  The trial court entered summary judgment for plaintiffs, finding that Merit wrongfully refused to pay plaintiffs certain postclosing sums recovered by Merit.  The trial court also found that Stern had personally guaranteed to indemnify plaintiffs for any damages they might suffer as a result of breach of the Agreement.  Defendants appeal and raise the following issues:  (1) whether, pursuant to the express language of section 6(b) of the Agreement, Merit's obligation to pay plaintiffs the contingent price contemplated in section 2(f) of the Agreement was excused by the Illinois Department of Insurance's objection; (2) whether enforcement of Merit's obligation to pay plaintiffs the contingent price under the Agreement is contrary to public policy; (3) whether Stern is a proper party to this suit and personally obligated to pay plaintiffs the contingent price under the indemnity provision of section 10(a) of the Agreement; and (4) whether plaintiffs' damages could be properly calculated on a motion for summary judgment.  Plaintiffs cross-appeal on the issue of one portion of the calculation of damages.

 In November 1990, plaintiffs owned shares in Merit Financial Corporation, a holding company that owned 100% of the stock of Merit Casualty Company, formerly known as Merit Insurance Company (Merit Insurance).  On November 9, 1990, plaintiffs entered into a written stock purchase agreement to sell their shares to Merit and Stern.

On September 21, 1994, plaintiffs filed suit against Merit and Stern seeking additional consideration from Merit pursuant to a contingent price provision contained in section 2(f) of the Agreement.  This provision provided:

"Merit shall pay an additional purchase price (the 'Contingent Price') to [plaintiffs], contingent upon any recovery by Merit Insurance Company pursuant to the proofs of claims of *** [the Claimants] against the insolvent estate of Midland Insurance Company and its excess insurance policy, XL 2625, filed with the Liquidation Bureau of the State of New York Insurance Department or the department of insurance or guaranty fund of any other state (collectively the 'Proofs of Claims'), which Proof of Claims were assigned to Merit Insurance pursuant to a settlement agreement dated June 7, 1990 by and among Merit Insurance and the Claimants.  The Contingent Price shall be paid in an amount equal to one-third of the net proceeds recovered by Merit Insurance pursuant to the Proofs of Claims.  For purposes hereof, net proceeds shall mean the gross amount (including interest) actually received by Merit Insurance pursuant to the order of the Liquidation Bureau of the State of New York Insurance Department or any court or governmental agency or any settlement of such Proofs of Claims, reduced by all federal, state and other income and other taxes incurred by Merit or Merit Insurance as a result of any recovery pursuant to such Proofs of Claims and further reduced by court costs, attorneys fees and costs and all other direct costs and expenses incurred by Merit Insurance in pursuing such Proofs of Claims, all as may be incurred by Merit Insurance from July 7, 1990 to the date of payment.  ***.  The Contingent Price shall be paid at the Closing [of the Agreement] to [plaintiffs], or if no recovery has been made at such time by Merit Insurance pursuant to such Proofs of Claims, within thirty days of any recovery by Merit Insurance pursuant to such Proofs of Claims."

By late 1993, Merit Insurance was experiencing financial difficulty and the Illinois Department of Insurance (DOI) issued the first of a series of corrective orders placing Merit Insurance under the supervision of the DOI.  Merit Insurance operated under the series of corrective orders from September 20, 1993, through January 11, 1995.  As of January 11, 1995, Merit Insurance has operated under an agreed plan of rehabilitation entered and approved by the circuit court of Cook County, Illinois, county department, chancery division (
In the Matter of the Rehabilitation of Merit Casualty Co.
, No. 94 CH 011337).

In October 1993, Merit Insurance received a payment of $250,000 from the Illinois Guaranty Fund on account of one of the proofs of claims referenced in the contingent price provision.  After unsuccessfully seeking payment, plaintiffs filed suit.  In count I, they sought recovery from Merit based on the contingent price provision.  In count II, they sought recovery from Stern personally based on the contingent price provision together with section 10(a), an indemnity provision.

On April 19, 1996, after a hearing, the trial court granted summary judgment in favor of plaintiffs and against Merit.  On May 30, 1996, after another hearing, the trial court entered a judgment of liability against Stern, found that the principal amount of the liability against Merit and Stern was $72,523.65, set the matter for further hearing on the issues of interest and attorney fees, and allowed discovery and briefing on those issues.  On July 17, 1996, the trial court entered a judgment against Merit and Stern for $72,523.65 in principal, $9,669.82 in interest, and $23,835.14 in attorney fees.  Merit and Stern appeal from the April 19, 1996, order, the May 30, 1996, order and the July 17, 1996, order.  Plaintiffs cross-appeal on the issue of the calculation of damages.

A.  EXCUSE FROM PAYMENT OF CONTINGENT PRICE

Merit and Stern's first argument is that the trial court erred as a matter of law in granting summary judgment for plaintiffs because, pursuant to the express provisions of the Agreement, Merit's obligation to pay plaintiffs the contingent price contemplated in section 2(f) of the Agreement was excused by the DOI's objection.  Merit and Stern fail, however, to provide any citations to the record or authority to support its argument, in violation of Supreme Court Rule 341(e)(7) (155 Ill. 2d R.   341(e)(7)).  "Arguments made without citation of supporting authority are deemed waived on appeal.  [Citation.]  The party who thus waives the question is bound by his waiver, but the court, which has the responsibility of reaching a just decision, is not so bound."  
In re Marriage of Winters
, 160 Ill. App. 3d 277, 281 (1987).  Accordingly, notwithstanding waiver, we will address this issue.

This case comes to us on a grant of summary judgment, so our review is 
de novo
.  
Barnett v. Zion Park District
, 171 Ill. 2d 378, 385 (1996).  Summary judgment is appropriate if the pleadings, depositions, and affidavits show that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law.  
Maher & Associates, Inc. v. Quality Cabinets
, 267 Ill. App. 3d 69, 77 (1994); 735 ILCS 5/2-1005(c) (West 1994).  A triable issue of fact exists where there is a dispute as to material facts or where the material facts are undisputed but reasonable persons might draw different inferences from those facts.  
In re  Estate of Hoover
, 155 Ill. 2d 402, 411 (1993).  The interpretation of a party's agreement or contract on appeal is a question of law to be determined by the appellate court 
de novo
.  
Best Coin-Op, Inc. v. Old Willow Falls  Condominium Ass'n
, 120 Ill. App. 3d 830, 833 (1983).

Merit and Stern assert that Merit's obligation under section 2(f) was excused by the DOI's objection and directs this court to section 6(b) of the Agreement, which provides:

"6.  
Conditions to Obligations of [Stern] and Merit
.  The obligations of [Stern] and Merit hereunder shall be subject to the delivery of those items required to be delivered by [plaintiffs] at the Closing and to the conditions that:

(a)  The representations and warranties made by [plaintiffs] herein shall be true at the Closing as though such representations and warranties were made at such time, and all of the terms and conditions of this Agreement to be performed and complied with; provided, however, [Stern] and Merit may waive any such condition by a statement in writing to that effect, delivered to [plaintiffs].

(b)  Neither [Stern] nor Merit shall have received notice of any inquiry, investigation or objection from any governmental agency or from any court of competent jurisdiction with respect to restraining, prohibiting or obtaining damages or other relief in connection with the execution or delivery of this Agreement or the consummation of the transactions contemplated hereby.

(c)  [Stern] and Merit shall have secured financing for the transactions contemplated hereby in an amount and on terms acceptable to [Stern] and Merit."

Merit and Stern argue that since the payment of the additional purchase price was contingent on the recovery of certain postclosing sums, the transaction would be consummated after the closing and, therefore, falls within the phrase "transactions contemplated" contained in section 6(b) of the Agreement.  Merit and Stern assert that since the DOI objected to the payment of the contingent price, then pursuant to the language of section 6(b) they were under no obligation to pay plaintiffs the contingent price contemplated under section 2(f) of the Agreement.

Plaintiffs contend that Merit and Stern's argument must fail for two reasons.  First, plaintiffs assert that the evidence refutes Merit and Stern's contention that the DOI prevented them from paying plaintiffs.  We agree.  

At the time Merit Insurance received the $250,000 payment from the Illinois Insurance Guaranty Fund, the first corrective order was in place and continued until the next corrective order was issued on December 20, 1993.  The first corrective order provided that "[a]ll expenses of Merit [Insurance] and its affiliates shall be subject to monthly review by this Department."  As plaintiffs assert, under the first corrective order, the DOI did not approve or disapprove expenses before they were paid.  Several deposition excerpts support this argument.

James Stephens of the DOI, the man immediately responsible for overseeing Merit Insurance while the corrective orders were in place, testified as follows concerning his review of Merit Insurance's expenses under the first corrective order:

"Q.  In other words, it wasn't a question of you telling Merit [Insurance] what it should or shouldn't pay?

A.  There was a certain amount of questioning of whether an expense was appropriate or not --

Q.  Uh-huh.

A.  --but not as a point of approving or disapproving ***.

Q.  So, again, the question is was the nature of your review still -- even though you may have reviewed it more carefully, as I understand it, you still were not in a position that you were saying don't pay this, for instance, or --

A.  No.

Q.  -- we're not going to pay this.  Am I correct?

A.  No.  My position was I was not doing that at that time.

Q.  All right.  And is it your understanding that that was not the nature of what your review should be under the terms of the [first] corrective order?

A.  Correct."

Jack Messmore, Stephens' immediate supervisor, testified similarly:

"Q.  Right.  In other words [M]erit wasn't required to ask for your permission to pay an expense before it paid it, is that correct?

A.  Right.

*** 

Q.  Okay.  So is it your understanding, having taken a look at this, that the expenses of Merit Financial Corporation were not -- as of the time that this first corrective order was in place were not subject to the approve by the [DOI]?

A.  That's true."

Additionally, plaintiffs assert that the DOI never forbade Merit from fulfilling its obligation to plaintiffs.  As the Agreement contemplated, the check from the Illinois Insurance Guaranty Fund was made out to Merit Insurance, but Merit Financial Corporation was liable to pay plaintiffs the contingent price under the Agreement.  Accordingly, Stern tried to "[get] permission to get the check deposited into Merit Financial [Corporation] and pay off this obligation [to plaintiffs] and then put the rest back into Merit Insurance."  Stern testified at his deposition as follows:

"Q.  And again, can you tell me exactly what it was that you made a request [of the DOI] to do?

A.  I asked the permission to bank this check in Merit Financial.

Q.  In other words, to deposit into Merit Financial's account?

A.  Yes.  Yes.  And so that payment could be made under the contract provision that Merit Financial owed on that, and the balance would then be put into Merit Insurance.  And they would not allow us to do that."

The deposition testimony of James Stephens and Jack Messmore indicates that Stern never directly asked if the check could be deposited into Merit's account.  Instead, Stern posed the question in the form of a hypothetical.  Stephens testified regarding his conversation with Stern as follows:

"Q.  Can you tell me what [Stern] said to you and what you told him?

A.  I really don't remember the specifics of it, but it was brought up as a hypothetical question, what if, if I remember correctly.  You know:  what if this happened?

Q.  And what specifically did he ask you?  What was the hypothetical?

A.  That something to the effect that if we received blank amount of money -- and I don't remember the amount [of] money -- from such a source, would we be able to distribute it in such a way?  ***. [H]e asked me in a hypothetical situation would the company be allowed to do whatever it was, and I think it was just a distribution from the Merit Insurance Company to the parent."

Jack Messmore testified:

"Q.  *** Now, looking back to these conversations that you had with Mr. Stephens and [your supervisor] and then again with Mr. Stephens, was it your understanding that when you were presented with the question from Mr. Stephens that it was a question concerning some events that had actually happened or that you had been presented with a hypothetical question?

A.  It was my understanding that it was hypothetical."

Moreover, Stern himself testified that the reason plaintiffs were not paid was not because of the corrective orders:

"Q.  So the reason that [plaintiffs] were not paid under the Stock Purchase Agreement within 30 days after the time the money came into Merit Insurance Company was not because of the corrective orders but was because they didn't have, Merit Financial Corporation didn't have the money?

A.  That's correct."

Accordingly, we conclude that based on a review of the record, it is clear that the DOI never objected to Merit's fulfillment of its obligation to plaintiffs. 

Accordingly, we find that the evidence supports the conclusion that the DOI did not object to the payment of the contingent price to plaintiffs.

B.  VIOLATION OF PUBLIC POLICY

Merit and Stern's next contention is that enforcement of the contingent price provision is contrary to public policy.  Specifically, they assert that payment of the contingent price to plaintiffs "would have threatened the financially troubled Merit Insurance" and "would have been directly offensive to the DOI's pronouncement and objection."  We disagree.

Describing the considerations that come into play in determining whether a contract violates public policy, this court has previously stated:

"In considering whether any contract is against public policy it should be remembered that it is to the interests of the public that persons should not be  unnecessarily restricted in their freedom to make their own contracts.  Agreements are not held to be void, as being contrary to public policy, unless they be clearly contrary to what the constitution, the statutes or the  decisions of the courts have declared to be the public policy or unless they be manifestly injurious to the public welfare."  
Schumann-Heink v. Folsom
, 328 Ill. 321, 330 (1927).

Whether a contract violates public policy depends on the peculiar facts and circumstances of each case, as well as the language of the contract itself.  
Braye v. Archer-Daniels-Midland Co.
, 175 Ill. 2d 201, 215-16 (1997).

Plaintiffs argue that the DOI's power to protect insurance policyholders does not extend to the cancellation of otherwise valid contracts.  We agree.  As plaintiffs point out, both cases that Merit and Stern cite in support of their public policy argument are inapplicable.  One case, 
Telenois, Inc. v. Village of Schaumburg
, 256 Ill. App. 3d 897 (1993), involved a contract clause imposing a $100,000 penalty for failure to meet a contract deadline.  The other case, 
Klubeck
 v. Division Medical X-Ray, Inc.
, 108 Ill. App. 3d 630 (1982), involved an agreement to pledge welfare reimbursements, in violation of the Public Aid Code.  Ill. Rev. Stat. 1979, ch. 23, par. 11-3.  Contrary to the contracts in the above cases, the Agreement is not illegal on its face.  Performance of the contract would not violate any Illinois law.  Moreover, Merit and Stern have already accepted all the benefits under the contract.

Merit and Stern also make a brief statement that DOI's objection made it legally impossible for Merit to make the payment of the contingent price to plaintiffs.  Since we have concluded that the record does not support Merit and Stern's contention that the DOI objected, we need not even address this "argument."

 Accordingly, we find that the contract does not violate public policy.

C.  LIABILITY OF STERN

Merit and Stern's third contention is that Stern was never obligated to pay the contingent price and is not a proper party to the suit under the language of the Agreement.  We disagree.

Merit and Stern cite the Agreement which, in various sections, sometimes refers to Merit, sometimes refers to Stern and sometimes to refers to both Merit and Stern.  Based on that, Merit and Stern argue that where the parties intended performance by Stern under a particular section, he was specifically included and, therefore, since only Merit is included in section 2(f), the contingent price provision, then only Merit is obligated under that provision.  We do not disagree.  However, it is section 10, the indemnification provision, not section 2(f), under which Stern is obligated.  Section 10 provides:

"(a)  [Stern] and Merit agree to indemnify and hold each of the Sellers [including plaintiffs] harmless from and against any and all claims, obligations, liabilities, losses, damages, costs and expenses (including reasonable legal fees and expenses) which Sellers may incur or suffer as a result of or in connection with (i) any violation or breach of any representation, warranty, covenant or agreement of [Stern] or Merit contained herein or (ii) any breach of this Agreement by [Stern] or Merit.

(b)  Sellers severally agree to indemnify and hold [Stern] and Merit harmless from and against any and all claims, obligations, liabilities, losses, damages, costs and expenses (including reasonable legal fees and expenses) which [Stern] or Merit may incur or suffer as a result of or in connection with (i) any violation or breach of any representation, warranty, covenant or agreement of such Seller contained herein or (ii) any breach of this Agreement by such Seller."

Merit and Stern argue that plaintiffs' argument that Stern should indemnify plaintiffs for an alleged breach of contract by Merit is a "perversion of the well-established meaning of indemnification" and cite 
Magnus v. Lutheran General Health Care System
, 235 Ill. App. 3d 173 (1992), in support.  However, 
Magnus
 is distinguishable from the case at bar and, further, the 
dicta
 relied on by Merit and Stern are not necessary to the outcome of that case.

 In 
Magnus
, the plaintiff-seller of real property sued the defendant-buyer after the sale, claiming that the plaintiff-seller had an option to remove a house from the property after the sale.  
Magnus
, 235 Ill. App. 3d at 178.  The defendant-buyer won and then claimed that it was entitled to attorney fees incurred in the lawsuit based on an indemnity clause in which the plaintiff-seller agreed to indemnify defendant-buyer from claims in connection with "[a]ny material misrepresentation, breach of any warranty or representation or nonfulfillment of any agreement, covenant or condition on the part of Seller" or with "any act, conduct, failure to act or omission to act of Seller which occurred or occurs at any time and which is not disclosed to Buyer as part of this [a]greement."  
Magnus
, 235 Ill. App. 3d at 184-85.  The appellate court concluded that the defendant-buyer was not entitled to indemnification, since "[the] indemnity clause [did] not include the costs [defendant-buyer] incurred in defending itself against [plaintiff-seller's] claims."  
Magnus
, 235 Ill. App. 3d at 185.  Unlike the claim in the case at bar, the claim in 
Magnus
 simply did not fall within the terms of the agreement.

Nevertheless, Merit and Stern refer us to the portion of the court's opinion where the court stated that "[a]n indemnity agreement is an agreement whereby the indemnitor agrees to protect the indemnitee from claims asserted against the indemnitee by third persons" and argue that the indemnification provision only applies when third parties are involved.  However, in the instant case, Stern can in no way sidestep the express terms of the indemnification provision wherein he agreed to indemnify plaintiffs "against any and all claims, obligations, liabilities, losses, damages, costs and expenses (including reasonable legal fees and expenses) which [plaintiffs] may incur or suffer as a result of or in connection with (i) any violation or breach of any representation, warranty, covenant or agreement of [Stern] or Merit contained herein or (ii) any breach of this Agreement by [Stern] or Merit."  

Accordingly, we conclude that under the express terms of the indemnification provision, Stern is a proper party to this action.

D.  DAMAGES

The contingent price provision provides that the amount due plaintiffs "shall be in an amount equal to one-third of the net proceeds recovered by Merit Insurance pursuant to the Proofs of Claims."  "Net proceeds" is defined as the gross amount actually received pursuant to an order of settlement of the proofs of claims "reduced by all federal, state and other income and other taxes incurred by Merit or Merit Insurance as a result of any recovery pursuant to such Proofs of Claims and further reduced by court costs, attorneys fees and costs and all other direct costs and expenses incurred by Merit Insurance in pursuing such Proofs of Claims, all as may be incurred by Merit Insurance from 
July 7, 1990
 to the date of payment.  [Emphasis added.]"   According to this provision, the proceeds are to be reduced by expenses incurred from 
July 7, 1990
 to the date of payment.  The Agreement, however, also refers to a collateral agreement which assigns the proceeds of the Midland recovery to Merit Insurance.  The collateral agreement is dated 
June 7, 1990
.  This is relevant to the calculation of damages because approximately $10,000 in legal expenses were incurred between June 7, 1990, and July 7, 1990.

The expenses involved were a number of legal bills from Holstein, Mack & Klein totalling $30,023.55 and a bill from Jenner & Block totalling $2,405.51.  The total from Holstein, Mack & Klein included a bill for $10,265.07, which was dated June 25, 1990.  The trial court found that this was includible in the total expenses and subtracted it from the gross amount.  Thus, the trial court awarded plaintiffs $72,523.65 (gross amount received was $250,000, less Holstein bill for $30,023.55, less Jenner bill for $2,405.51 divided by three to arrive at $72,523.65 one-third of net proceeds).

1.  Starting Date for Calculation of Expenses

Merit and Stern's argument is that the calculation of damages can not be properly disposed of on summary judgment.  Specifically, they contend that there was a factual dispute over the starting date for expenses used in calculating the contingent price.  Plaintiffs assert that the disputes are not factual and, therefore, do not preclude summary judgment.  Plaintiffs also argue on cross-appeal that the expenses should be calculated from the July 7, 1990, start date.  

We first address whether there was an ambiguity regarding the starting date.  The question of whether a contract is clear or ambiguous is a question of law for the court.  
Tishman Midwest Management Corp. v. Wayne Jarvis, Ltd.
, 146 Ill. App. 3d 684, 688 (1986).  "Once the trial court has interpreted the contract as a matter of law, the reviewing court may likewise independently construe the contract."  
Tishman
, 146 Ill. App. 3d at 689.  We note that contractual language is not ambiguous simply because the parties disagree upon its meaning.  
Srivastava v. Russell's Barbecue, Inc.
, 168 Ill. App. 3d 726, 732 (1988).  The primary objective in contract construction is to give effect to the intention of the parties and that intention is to be ascertained from the language of the contract.  
Srivastava
, 168 Ill. App. 3d at 730.  If a contract is clear and unambiguous, the judge must determine the intention of the parties "solely from the plain language of the contract" and may not consider extrinsic evidence outside the "four corners" of the document itself.  
Tishman
, 146 Ill. App. 3d at 689.  "Clear and unambiguous contract terms must be given their ordinary and natural meaning" and contracts must be interpreted "as a whole, giving meaning and effect to each provision thereof."  
Srivastava
, 168 Ill. App. 3d at 730.

We find that the Agreement does not contain an ambiguity.  While it does refer to proofs of claims being assigned to Merit Insurance on June 7, 1990, that is not necessarily inconsistent with the July 7, 1990, start date for the calculation of expenses.  As plaintiffs assert, there is no reason those dates have to be the same.  The contingent price provision plainly states that expenses incurred "from July 7, 1990 to the date of payment" are to be subtracted to determine net proceeds.

Accordingly, we find that the trial court erred in including the June 25, 1990 bill for $10,265.07 in the calculation.  This would result in an increase in principal of $3,421.69 plus interest pursuant to section 2 (815 ILCS 205/2 (West 1992)) at the rate of 5% per annum from the date due of November 30, 1993, to the date of judgment.

2.  Attorney Fees

Merit and Stern's final argument is that plaintiffs' claim for attorney fees incurred in bringing this action is improper because there is no provision in the Agreement for awarding such fees, other than the indemnification clause which, Merit and Stern argue, does not apply.  

We have previously addressed Merit and Stern's contention that the indemnification provision does not apply in suits between the parties.  Since we have concluded that the indemnification provision does apply to actions between plaintiffs and Merit and Stern, we also find that, pursuant to the terms of that provision, the lower court's award of attorney fees was proper since section 10 provides for, among other things, payment of "reasonable legal fees and expenses."  

We reject Merit and Stern's argument that, even if attorney fees could be awarded, the calculation of such fees is ill-suited for determination on summary judgment.  In awarding attorney fees, only those fees that are reasonable charges for reasonable services will be allowed.  
Kaiser v. MEPC American Properties, Inc.
, 164 Ill. App. 3d 978, 983 (1987).  The determination as to what constitutes reasonable compensation is a matter peculiarly within the discretion of the trial court and that determination will not be disturbed on review absent an abuse of discretion.  
Harris Trust & Savings Bank
 v. American National Bank & Trust Co.
, 230 Ill. App. 3d 591, 595 (1992); 
In re Estate of Healy
, 137 Ill. App. 3d 406, 411 (1985).

We find that the lower court did not abuse its discretion when it awarded plaintiffs attorney fees.  After allowing Merit and Stern discovery and a hearing on the issue, the trial judge awarded plaintiffs $23,835.14 for attorney fees and costs, striking $330 from the amount requested.  Principal and interest were $82,193.47, for a total judgment of $106,028.61.  Thus, fees and expenses were about 22% of the total recovery.  As plaintiffs point out, simply questioning the reasonableness of the fees does not create a factual dispute sufficient to preclude summary judgment.  The court had before it adequate evidence of the fees, including affidavits and time records from all attorneys for whom fees were sought.  Accordingly, we find that the award of attorney fees was proper.

For the foregoing reasons, we hereby affirm the trial court's order granting summary judgment in favor of plaintiff.  In addition, we hereby modify the trial court's award pursuant to plaintiffs' cross-appeal.

Affirmed as modified.

O'BRIEN and O'MARA FROSSARD, JJ., concur.