ORION REFINING CORPORATION
and John Stanley, Appellants,

v.

UOP, A General Partnership; UOP
LLC; EM Sector Holdings, Inc.; and
Catalysts, Adsorbents and Process
Systems, Inc., Appellees.

No. 01–05–00681–CV.

Court of Appeals of Texas,
Houston (1st Dist.).

Oct. 4, 2007.

 
 
 

Alexander C. Chae, Gardere, Wynne, Sewell & Riggs, L.L.P., Joe C. Holzer, John A. Lee, Andrews & Kurth, L.L.P., Houston, Elizabeth Ann Wiley, Stacy R. Obenhaus, Andrews Kurth LLP, Austin, Lisa L. Honey, Gardere Wynne Sewell LLP, Dallas, TX, for Appellant.

Jason Luong, Lee L. Kaplan, Smyser Kaplan & Veselka, L.L.P., Houston, TX, for Appellee.

Panel consists of Chief Justice RADACK and Justices JENNINGS and BLAND.

## OPINION

SHERRY RADACK, Chief Justice.

Appellant, Orion Refining Corporation, challenges the summary judgment rendered in favor of appellees, UOP, a General Partnership; UOP, LLC; and Catalysts, Adsorbents and Process Systems, Inc. (collectively, UOP) on Orion's breach-of-contract and extra-contractual claims.[1] Orion's first issue presents a broad challenge to the summary judgment that dismissed all of Orion's claims; Orion's fifth issue asks whether Orion's summary judgment evidence raises material questions of fact on elements of Orion's claims. In addition to these global issues, Orion presents three specific challenges, as follows:

---

1. This record on appeal has been partially sealed by order of the trial court. *See* TEX.R. CIV. P. 76a.

(1) whether UOP conclusively defeated Orion's extra-contractual claims under Illinois law, (2) whether Orion stated a viable action for common-law fraud under Illinois law or under the Illinois Consumer Fraud and Deceptive Business Practices Act,[2] and (3) whether Orion has viable claims for breach of contract and negligence under Illinois law. Appellant John Stanley presents a single issue contending that the trial court abused its discretion by striking Stanley's petition to intervene in Orion's action. We affirm.

## Facts and Procedural History

### A. Background

UOP obtained a licensing agreement from the BAR–CO Processes Joint Venture (BARCO) in 1994. By this agreement, UOP acquired rights to use BARCO's "patents and technical information relating to the MSCC process,"[3] as an improvement over existing catalytic-conversion processes used in oil refining. It is undisputed that the MSCC process was newly patented technology.

UOP and Orion's predecessor-in-interest, TransAmerican Refining Corporation (TransAmerican), executed an agreement, described as a license,[4] engineering, and guarantee agreement (the agreement, or the TransAmerican–UOP agreement), which is dated May 1, 1995 and incorporates six attachments. The agreement recites that UOP and TransAmerican exchanged mutual rights and responsibilities concerning TransAmerican's use of the "MSCC process"[5] at a refinery in Louisiana, where TransAmerican planned to replace the refinery's existing catalytic converter with one using the MSCC process. Stanley signed the agreement in a representative capacity, as chairman and chief executive officer of TransAmerican.

**2.** 815 ILL. COMP. STAT. ANN. 505/2 (West 1998).

**3.** The rubric "MSCC" stands for the trademarked term, "Milli–Second Catalytic Cracking.™" The agreement refers to the both MSCC and Milli–Second Catalytic Cracking as "proprietary names."

**4.** With respect to licensing, the agreement provided for a mutual exchange of rights pertaining to UOP's patent rights. The agreement describes the license as "nonexclusive" and recites that it was granted to UOP and its subsidiaries, both of which were granted the right to grant sublicenses.

**5.** As defined in the TransAmerican–UOP agreement, the milli-second aspect of the MSCC process implies that many factors, in addition to those described as milli-second, will occur simultaneously. The contract defines the MSCC *process* as follows: "a process for converting a charge stock consisting essentially of petroleum-type hydrocarbons which are liquid at high or normal temperature and normal pressure, primarily to produce motor fuels or other liquid fuels or napthas of an average, molecular weight lower than that of the charge stock, together with by-product, normally gaseous hydrocarbons," such conversion being carried out:

a. at temperatures in excess of 500 degrees Fahrenheit,

b. with a solid catalyst present in a non-riser reaction zone for the specific purpose of effecting or influencing the reaction and whereby there is produced a result as to yield, character of product or speed of reaction different to a definitely determinable degree from the result which would be produced with the same starting materials under conditions otherwise the same but in the absence of such catalyst, and

c. without significant chemical consumption of hydrogen; and in which process:

d. the conversion and catalyst regeneration proceed in separate zones with transfer of catalyst between zones,

e. the catalyst is maintained in the reaction zone in the form of an essentially horizontally flowing fluid mass made up of finely divided catalyst dispersed in the hydrocarbon vapors undergoing conversion, and

f. the average residence time of the catalyst in the reaction zone is greater than the average residence time of the hydrocarbon vapors in said zone.

The agreement recites background information explaining that TransAmerican solicited bids relating to the MSCC process from UOP for the "detailed design, procurement, construction, operation and maintenance" of an existing TransAmerican unit at Norco, Louisiana.[6] TransAmerican sought to "revamp and convert" the Norco unit to an "MSCC Process unit."[7] The agreement specifies that TransAmerican consulted UOP to "provide engineering and technical advisor services" relating to the MSCC process for the Norco unit,[8] but that "design, procurement, construction, operation, and maintenance" of the unit remained with TransAmerican. TransAmerican paid UOP $3.5 million for the rights conferred by the agreement.

UOP had previously extended an MSCC license to only one other facility, a New Jersey refinery known as CEPOC. According to Orion's pleadings, although only three refineries in the world use the MSCC process, the Norco unit is one-of-a kind among these three. Orion became the owner of the Norco unit in 1998, when TransAmerican was forced to sell the unit to creditors who financed the reconstruction and foreclosed. The shareholders of Orion are TransAmerican's former creditors. The record reflects that Orion's purchase was an asset transfer of TransAmerican's property, including TransAmerican's rights under the agreement with UOP.[9]

Construction of the Norco unit was not yet complete when TransAmerican transferred its assets to Orion in 1998, and TransAmerican did not even begin construction until 1997, over two years after the TransAmerican–UOP agreement was executed. Construction was halted in 1998 due to TransAmerican's financial difficulties. After taking over TransAmerican's assets in 1998, Orion paid UOP $135,000 to conduct a study to determine whether to continue constructing the Norco unit.[10] Operation of the unit did not occur until June 2000, when the unit was completed. Problems developed after startup, however, and required several months of shutdowns and expenses for repairs.

## B. Key Terms of the Agreement

Article 7 of the agreement between TransAmerican and UOP addresses "Responsibility and Liability" of both TransAmerican and UOP. Pursuant to article 7.1, UOP warranted that the services to be provided under the agreement would be "performed according to accepted engineering practices."[11] As article 7.1 further provided, "the exclusive remedy" for breach of "this warranty"—specifically, the warranty to perform according to accepted engineering practices—UOP would "reper-

---

**6.** Orion's pleadings state that TransAmerican acquired the Norco unit in 1971. The unit was built in 1969, but had been shut down from 1983 until 1994, when TransAmerican began the rebuilding program that included converting to the MSCC process.

**7.** The Norco unit was to be converted to the MSCC process from the Fluidized Catalytic Cracking (FCC) process, which had previously been the norm for catalytic conversion for refineries.

**8.** According to Orion, its "stakeholders ... are the unpaid creditors who loaned [TransAmerican] the money to build the unit at the refinery that is the subject matter of this dispute."

**9.** See C.M. Asfahl Agency v. Tensor, Inc., 135 S.W.3d 768, 780–81 (Tex.App.-Houston [1st Dist.] 2004, no pet.) (addressing implications of asset transfer); TEX. BUS. ORG.CODE ANN. § 10.254 (Vernon 2006) ("Disposition of Property Not a Merger or Conversion; Liability").

**10.** This case does not involve or address any claims related to the study or to any other agreement, to the extent that any may exist.

**11.** We refer to article 7.1 as the engineering warranty.

form," at its own expense, "that portion of the services for which a breach ha[d] occurred." "Any claim for breach of this warranty," however, had to "be made in writing within one year after the Start of Initial Operation,[12] but in no event later than three years after the date of this agreement."

With respect to performance, article 7.2 of the agreement states that the "guarantees relating to the performance of the Unit are specified in Attachment V,"[13] and further states, "Except as specified in article 7 and in Attachment V, **UOP MAKES NO WARRANTIES OR GUARANTEES, EXPRESS OR IMPLIED.**" (Emphasis and upper case in original.)

Attachment V specifies the details of UOP's performance guarantee, the performance tests contemplated, and UOP's responsibility. Article 1, paragraph 1.1 of Attachment V guaranteed that "during a Performance Test[14] conducted according to 2.1," the unit would meet rates, as specified in paragraph 1.1(a)—(d) for processing, minimum percentage of gasoline yield and conversion, and maximum consumption of catalyst.[15] Article 2.1 of Attachment V imposed six "Conditions" on the article 1.1 guarantee. Pursuant to one of these conditions, however, as stated in article 1.2 and its subsection (b), the guarantee would apply "only if . . . the Start of Initial Operation occurs within three years after the start of this agreement."[16]

Article 7.3 of the agreement qualified that TransAmerican would "at all times remain solely responsible for the detailed design, procurement, construction[,] and maintenance of the Unit." Pursuant to article 7.4, UOP's liability for bodily injury or property damage arising out of its services was restricted to damages "caused by the willful misconduct or negligence of UOP." And as article 7.4 further specified,

**IN NO EVENT [WOULD] UOP BE LIABLE FOR SPECIAL, CONSEQUENTIAL, OR INDIRECT DAMAGES, INCLUDING, BUT NOT LIMITED TO, LOSS OF PROFITS OR LOSS OF USE.** This limitation shall apply whether the cause of action relates

12. Attachment I to the agreement defined "Start of Initial Operation" as "that moment when hydrocarbons are first introduced into the battery limits of the Unit with the intent to operate the MSCC Process."

13. We refer to the provisions of *Attachment V* as the performance guarantee.

14. Attachment I to the agreement defined "Performance Test" as "a period of three (or less[,] if mutually agreed) consecutive Operating Days scheduled for the purpose of comparing the performance of the Unit with the Performance Guarantee." Attachment I defined "Operating Day" as "a continuous period of 24 hours during which the Unit is on stream."

15. The maximum rate for catalyst consumed was not specified, pending receipt of further information from "the cyclone vendor."

16. The five remaining conditions addressed conformity to UOP's design specifications; UOP approval of the catalyst used; furnishing of all required materials, facilities, and personnel by TransAmerican; operation, shutdown, and restarting per UOP's instructions; UOP presence before and during performance testing; and testing in conformity with the terms of the agreement.

Pursuant to paragraph 2.1 of Attachment V, UOP would conduct the first performance test within 90 days of the Start of Initial Operation. Paragraph 2.2 provided that UOP would determine and notify TransAmerican whether "the applicable Performance Guarantee [was] met" and that the guarantee would "be deemed to have been met" unless TransAmerican disputed UOP's notice within 15 days. Paragraph 3.1 defined the parameters of UOP "option to fix" or, alternatively, a schedule of liquidated damages, should the Performance Guarantee not be met "during the Performance Test permitted under paragraph 2.1."

to this agreement or arises out of the technology, goods[,] or services provided by UOP under this agreement, and shall apply regardless of the legal theory (tort or contract) upon which the action is based.

(Emphasis and upper case in original.) In addition, article 7.7 expressly limited "UOP's aggregate liability" under the agreement to $1.4 million, "except for UOP's expenses (if any) associated with any breach of the warranty in Article 7.1," specifically, the engineering warranty to perform according to accepted engineering practices.

Finally, pursuant to Article 13, the May 1, 1995 agreement "embodie[d] the entire understanding between the parties relating to the subject of th[e] agreement"; there were "no related prior representations or agreements."

## D. Procedural History

Orion sued UOP in March 2002. Orion's live pleadings allege that UOP (1) fraudulently misrepresented the MSCC process by knowingly, and with reckless disregard for the truth, concealing material information that, if provided, would have precluded the agreement; (2) fraudulently induced the agreement, which fraud was not excused by the agreement's "**NO WARRANTIES OR GUARANTEES, EXPRESS OR IMPLIED**" provision (emphasis and upper case in original); (3) owed UOP attorney's fees under the Illi-

nois deceptive trade practices act; (4) was negligent; (5) was equitably estopped from denying its liability; (6) negligently misrepresented the MSCC process; (7) breached the agreement; and (8) violated the Illinois Consumer Fraud Act.

Soon after Orion filed its original petition, UOP filed a unified pleading that combined special exceptions and a motion for traditional summary judgment. UOP based its motion for summary judgment solely on the agreement. Orion then conducted extensive discovery and filed several responses, to which UOP filed replies. Orion amended its pleadings three times. The trial court conducted three oral hearings that are not part of the record on appeal.

After an initial interlocutory summary judgment rendered in UOP's favor on all of Orion's claims except one, for which the trial court sustained UOP's special exceptions, the trial court later rendered a final summary judgment in favor of UOP and granted UOP's motion to strike the petition by which Stanley sought to intervene in the lawsuit. The trial court did not state the grounds on which it rendered summary judgment, but the record reflects that the trial court took judicial notice of Illinois case law, in response to Orion's requests. Because the summary-judgment record shows that the parties relied on Illinois law, we assume, but do not decide, that Illinois law controls.[17]

---

17. Orion's arguments on appeal encompass tort claims and contract claims. Orion's appellant's brief asserts rights under Illinois law, but Orion also relies on Texas law. The same is true of UOP. Both parties relied virtually exclusively on Illinois law in the trial court until very late in the case, when Orion began to invoke Texas precedent to support its position. Article 15, the choice-of-law provision in the TransAmerican–UOP agreement, which is entitled "Governing Law," states that "[t]his *agreement* shall be governed by the laws of the State of Illinois." (Emphasis add-

ed.) A choice-of-law provision that addresses only the parties' agreement, as here, "does not purport to encompass all disputes between the parties or to encompass tort claims" that do not depend on interpretation and enforcement of the agreement. *Stier v. Reading & Bates Corp.*, 992 S.W.2d 423, 433 (Tex.1999). Trial courts may not render summary judgment for a reason not presented to the trial court, and this Court may address only those grounds actually presented to the trial court. *See Cincinnati Life Ins. Co. v. Cates*, 927 S.W.2d 623, 625 (Tex.1996).

## Summary Judgment against Orion

### A. Standard of Review—in General

We review summary judgments de novo, as questions of law. *Valence Operating Co. v. Dorsett,* 164 S.W.3d 656, 661 (Tex. 2005). Because the trial court did not state the grounds on which it rendered summary judgment, we may affirm the ruling on any meritorious theory on which UOP relied to defeat Orion's claims. *See Joe v. Two Thirty Nine Joint Venture,* 145 S.W.3d 150, 156–57 (Tex.2004). Summary judgment is proper only if UOP, as movant, established the absence of any genuine issue of material fact and that it was entitled to judgment as a matter of law. *See Rhône–Poulenc, Inc. v. Steel,* 997 S.W.2d 217, 222 (Tex.1999). To prevail by traditional summary judgment against Orion's causes of action, UOP had to defeat at least one essential element of each of them. *See Science Spectrum, Inc. v. Martinez,* 941 S.W.2d 910, 911 (Tex.1997).

Once the movant establishes that it is entitled to summary judgment, the nonmovant can defeat that showing only by producing evidence that raises a genuine issue of material fact. TEX.R. CIV. P. 166a(c); *Walker v. Harris,* 924 S.W.2d 375, 377 (Tex.1996). In reviewing a summary judgment, we assume that all evidence that favors the nonmovant is true, and we indulge every reasonable inference and resolve any reasonable doubt in the nonmovant's favor. *Valence Operating Co.,* 164 S.W.3d at 661.

A fact is "material" and will preclude summary judgment if it affects the outcome of the suit under the substantive law. *See Collins v. Guinn,* 102 S.W.3d 825, 834 (Tex.App.-Texarkana 2003, pet. denied).

A material fact issue is "genuine" only if a reasonable jury could find the fact in favor of the nonmoving party based on that fact. *See Lampasas v. Spring Ctr., Inc.,* 988 S.W.2d 428, 433 (Tex.App.-Houston [14th Dist.] 1999, no pet.) (decided under TEX.R. CIV. P. 166a(i)).

### B. *"Malooly"* and "Global" Issues

Orion's first and fifth issues, respectively, present broad challenges to the summary judgment by asking whether the trial court erred by rendering summary judgment on all of Orion's claims and whether Orion's summary judgment evidence raised fact issues. The first issue invokes the *"Malooly* rule," *see Malooly Bros., Inc. v. Napier,* 461 S.W.2d 119, 121 (Tex.1970), and the fifth issue restates the standard that controls our review of the summary-judgment evidence. *See Science Spectrum, Inc.,* 941 S.W.2d at 911. These issues are encompassed by our disposition of the three specific issues that we address below, all of which Orion has supported with argument and authorities, as required by rule 38.1(h). *See* TEX.R.APP. P. 38.1(h) (requiring that appellant's brief contain arguments to support contentions). Because Orion has not supported its first and fifth issues with additional arguments that are independent of and distinct from its second, third, and fourth issues, we deem the first and fifth issues addressed by and disposed of by our analysis of Orion's second, third, and fourth issues. *See id.; Henriquez v. Cemex Mgmt., Inc.,* 177 S.W.3d 241, 255 (Tex.App.-Houston [1st Dist.] 2005, pet. denied) (holding broad *"Malooly"* point sufficient to support contention challenging all possible grounds on

UOP's motion and its replies, as well as Orion's responses, must "stand or fall," therefore, on the grounds presented in those filings in the trial court. *See Science Spectrum, Inc. v. Martinez,* 941 S.W.2d 910, 912 (Tex.1997). Because UOP did not dispute that Illinois law

applied and relies on the Illinois choice-of-law provision, moreover, in briefing its third issue, we decline to determine sua sponte whether Texas law governs Orion's tort claims.

which summary judgment rendered, if supported by argument; distinguishing *Malooly Bros., Inc.,* 461 S.W.2d at 121).

## Breach of Contract

As part of its fourth issue, Orion contends that it has viable claims for breach of contract that are not precluded by the agreement and, therefore, that the trial court erred by rendering summary judgment in favor of UOP on the breach-of-contract claim. Orion further contends that the limitations on damages, in articles 7.4 and 7.7 of the agreement, and the duration clauses for the engineering warranty stated in article 7.1 and the performance guarantee stated Attachment V, article 1.2(b) of the agreement, are exculpatory provisions that render the agreement "a nullity" and, therefore, unenforceable as a matter of law.

### A. Interpretation of Written Agreements under Illinois Law

#### 1. *General Principles*

 Illinois courts construe contracts de novo as questions of law. *See Avery v. State Farm Mut. Auto. Ins. Co.,* 216 Ill.2d 100, 296 Ill.Dec. 448, 835 N.E.2d 801, 821 (2005). The primary objective is give effect to the parties' intent, which the court ascertains from the language used in the agreement. *See id.; Lewis X. Cohen Ins. Trust v. Stern,* 297 Ill.App.3d 220, 231 Ill.Dec. 447, 696 N.E.2d 743, 751 (1998); *see also W.W. Vincent & Co. v. First Colony Life Ins. Co.,* 351 Ill.App.3d 752, 286 Ill.Dec. 734, 814 N.E.2d 960, 966 (2004). In the absence of ambiguity, which is also a question of law, but not an issue in this case, courts determine the parties' intent " 'solely from the plain language of the contract' " and may not go beyond its four corners. *See Lewis X. Cohen,* 231 Ill.Dec.

447, 696 N.E.2d at 751 (quoting *Tishman Midwest Mgmt. Corp. v. Wayne Jarvis, Ltd.,* 146 Ill.App.3d 684, 102 Ill.Dec. 538, 500 N.E.2d 431, 434 (1986)). Illinois courts accord clear and unambiguous terms their "ordinary and natural meaning" and must interpret contracts "as a whole, giving meaning and effect to each provision" in the agreement. *Id.* (quoting *Srivastava v. Russell's Barbecue,* 168 Ill. App.3d 726, 119 Ill.Dec. 562, 523 N.E.2d 30, 33 (1988)).

#### 2. *Agreements between Business Entities*

It is undisputed that both TransAmerican and UOP were established business entities and that they negotiated their agreement at arm's length.

 Illinois public policy, as "found in [the] constitution, statutes[,] and judicial decisions" of the state, "strongly favors freedom to contract." *McClure Eng'g Assocs. v. Reuben H. Donnelley Corp.,* 95 Ill.2d 68, 69 Ill.Dec. 183, 447 N.E.2d 400, 402 (1983).[18] An exception may arise for publicly regulated contracts like those involving innkeepers, landlords, and professional bailees, for which the Illinois Supreme Court has expressed "judicial concern with balancing the need to respect the right to freely contract with the need to protect parties from unfair provisions." *Id.; see Willmott v. Fed. Street Advisors, Inc.,* No. 05C1124, 2006 WL 3743716, at *8 (N.D.Ill.2006) (memo op.).

 This case does not involve a publicly regulated contract. When interpreting nonregulated contracts that have been negotiated at arm's length between private business entities, as is undisputed here, Illinois decisions reflect "a widespread pol-

---

18. *See McClure Eng'g Assocs. v. Reuben H. Donnelley Corp.,* 95 Ill.2d 68, 69 Ill.Dec. 183, 447 N.E.2d 400, 402 (1983) (defining "public

policy" as principle declaring that "no one may lawfully do that which has a tendency to be injurious to the public welfare").

icy of permitting competent parties to contractually allocate business risks as they see fit." *McClure Eng'g,* 69 Ill.Dec. 183, 447 N.E.2d at 402–03; *Hicks v. Airborne Express, Inc.,* 367 Ill.App.3d 1005, 306 Ill. Dec. 603, 858 N.E.2d 48, 54 (2006) (citing *McClure Eng'g,* 69 Ill.Dec. 183, 447 N.E.2d at 403); *see also Vigortone AG Prods., Inc. v. PM AG Prods., Inc.,* 316 F.3d 641, 645 (7th Cir.2002) (noting, in context of integration clause construed under Illinois law, that Illinois policy favors enforcing terms of contract negotiated "between sophisticated commercial enterprises").

### 3. *Exculpatory and Limiting Provisions*

#### a. *In General*

This appeal centers on terms and provisions in the TransAmerican–UOP agreement that limit the parties' remedies. These terms and provisions include the following, which appear above in more complete versions: (1) the time limitations stated in the portion of article 7.1, pursuant to which reperformance by UOP would be the exclusive remedy for failure of UOP to perform according to accepted engineering practices; (2) the portion of article 7.2 that refers to Attachment V and specifies that, except as provided by article 7 or Attachment V, UOP made **"NO WARRANTIES OR GUARANTEES, EXPRESS OR IMPLIED"** (emphasis and upper case in original); (3) the portion of article 7.3 that placed sole responsibility for detailed design, procurement, construction and maintenance of the unit on TransAmerican; (4) the portion of article 7.4 that limited UOP's liability for bodily injury or property damage arising out of its services to those caused by its willful misconduct or negligence; (5) an additional portion of article 7.5 that barred recovery from UOP for "special, consequential[,] or indirect damages, including, but not limited to, loss of profits or loss of use ...." (emphasis and upper case omitted here);

(6) the portion of article 7.7 that limited UOP's aggregate liability to $1.4 million, except for breach of the engineering warranty stated in article 7.1; and (7) the time limitations on the performance guarantee stated in Attachment V.

Illinois courts enforce exculpatory or limiting provisions like these in contracts that have been negotiated between sophisticated business owners, as here, on the grounds that competent parties to a business agreement are free to allocate their respective risks. *See McClure Eng'g,* 69 Ill.Dec. 183, 447 N.E.2d at 402–03. In accordance with settled Illinois policy favoring freedom of contract between business owners, exculpatory or limiting provisions require no specialized rules of interpretation in Illinois. *See id.*

Under an exception to this policy, Illinois courts will not enforce exculpatory and limiting provisions when they are unconscionable and result from unreasonable bargaining power and thus violate the public policy that generally favors freedom of contract. *See Willmott,* 2006 WL 3743716 at *8 (surveying Illinois law); *see also Premier Transport, Ltd. v. Nextel Comm., Inc.,* No. 02C4536, 2003 WL 21267096, *4 (N.D.Ill.2003) (unreported memo op.) (same) (citing *First Fin'l Ins. Co. v. Purolator Sec., Inc.,* 69 Ill.App.3d 413, 26 Ill. Dec. 393, 388 N.E.2d 17, 21 (1979)) (citing *Checkley v. Ill. Cent. R.R. Co.,* 257 Ill. 491, 100 N.E. 942, 943–44 (1913)). Orion does not expressly contend that the TransAmerican–UOP agreement is unconscionable or that it violates public policy, but contends that we must construe the agreement against UOP and has relied on authorities that recognize the exception.

Illinois public policy will not bar enforcement of an exculpatory or limiting provision on grounds of unconscionability unless giving effect to the clause will

categorically absolve the breaching party of *any* liability for breach of the promise that forms the basis of the contract. *See Jewelers Mut. Ins. Co. v. Firstar Bank Illinois*, 213 Ill.2d 58, 289 Ill.Dec. 635, 820 N.E.2d 411, 413–15 (2004); *Willmott*, 2006 WL 3743716 at *8 (citing *Jewelers Mut.*, 289 Ill.Dec. 635, 820 N.E.2d at 415). When enforcing the clause would categorically absolve the breaching party of any liability for breach, Illinois courts will strictly construe the limiting, exculpatory language against the party benefitted. *See Jewelers Mut. Ins. Co.*, 289 Ill.Dec. 635, 820 N.E.2d at 414–16; *Willmott*, 2006 WL 3743716 at *8 (emphasizing that enforcing agreement construed in *Jewelers Mutual* would have completely absolved defendant bank of any liability).

 Exculpatory and limiting clauses that merely *limit* remedies do not render a contract unenforceable. *See Willmott*, 2006 WL 3743716, *8 (citing *Jewelers Mut.*, 289 Ill.Dec. 635, 820 N.E.2d at 415). As the party seeking to avoid an exculpatory clause or limitation, Orion has the burden to establish unenforceability. *Id.*; *see Reuben H. Donnelley Corp.*, 169 Ill.Dec. 521, 592 N.E.2d at 11.

b. *The Jewelers Mutual Case*

 Orion contends that the limitations on damages, in articles 7.4 and 7.7 of the TransAmerican–UOP agreement, as well as the time limits for the engineering warranty in article 7.1 and the performance guarantee in Attachment V, article 1.2(b) render the agreement unenforceable under *Jewelers Mutual*, require that we construe the limitations and exculpatory provisions be construed against UOP, and compel that we reverse the summary judgment in UOP's favor and remand the cause for a trial on damages. We disagree.

In *Jewelers Mutual*, the Supreme Court of Illinois rejected a bank's attempt to disclaim liability for theft of over $1 million worth of merchandise stored in three of

the bank's safety-deposit boxes. 289 Ill. Dec. 635, 820 N.E.2d at 412, 417. Relying on exculpatory language in the rental contracts executed by jewelers who rented the bank's safety-deposit boxes, the bank had prevailed by summary judgment in the trial court based solely on the exculpatory clause in the rental contract, pursuant to which the jewelers who rented the boxes "assume[d] all risks." *Id.* at 412–13. The Illinois Supreme Court rejected the bank's reliance on the exculpatory cause. *Id.* at 417.

*Jewelers Mutual* is distinguishable from this case on several grounds. We first note that ambiguity had not only been raised in the trial court proceedings, but that the Illinois Supreme Court ruled that the trial court had correctly concluded that the rental contract for the safety-deposit boxes was ambiguous. *Id.* at 413, 417. The ambiguity arose because the contract disclaimed any liability whatsoever, but simultaneously assumed a duty of care that "formed the heart of the parties' agreement." *Id.* at 415. Orion neither claims that the TransAmerican–UOP agreement is ambiguous, nor directs us to conflicting provisions in the agreement, and we discern no similarly irreconcilable provisions in the agreement. Accordingly, the reasoning that required strict construction against the bank in *Jewelers Mutual* does not apply, *see id.* at 413, and we need not construe the TransAmerican–UOP agreement strictly against UOP in applying Illinois law.

The *Jewelers Mutual* court refused to permit the bank to enforce the assumed-all-risks provision against the jewelers because the bank had not only assumed an express duty of care in the contract, but, in addition, conceded that it had (1) negligently carried out that duty and (2) breached the contract. *Id.* at 413. Given these circumstances, the court reasoned

that permitting the bank to escape liability based on the assumed-all-risks provision would result in the bank's avoiding liability even if it were to "hand[ ] the keys to anyone who came in off the street and asked for them." *Id.* ¶ 417. But the circumstances in *Jewelers Mutual* that warranted departure from "a wide-spread policy of permitting competent parties to contractually allocate business risks as they see fit," *see McClure Engineering*, 69 Ill.Dec. 183, 447 N.E.2d at 403, have no correspondingly similar circumstances in this case.

Likewise, there is no claim of ambiguity here, and, in contrast to the bank's posture in *Jewelers Mutual*, UOP has not conceded either negligence or that it breached the agreement. More importantly, the exculpatory language in *Jewelers Mutual*, which negated *any* risk for the bank while placing *all* risk on the renters and thus compelled a strict construction against the bank, *see Jewelers Mutual*, 289 Ill.Dec. 635, 820 N.E.2d at 413, contrasts starkly with the freely negotiated reciprocity of risks and benefits to both parties in the TransAmerican–UOP agreement.

Unlike the safety-deposit rental contracts construed in *Jewelers Mutual*, the agreement here does not benefit UOP exclusively while passing all risks to TransAmerican and its successor, Orion. It is undisputed that all exculpatory portions of the agreement, like all terms of the agreement, resulted from negotiation between sophisticated business owners regarding use of newly trademarked technology. Though the exculpatory provisions that Orion attacks limited certain damages and disclaimed warranties or guarantees not recited in the agreement, the remainder of the agreement simultaneously provides remedies, not only by an engineering warranty and by a performance guarantee, but also envision reperformance. And though the agreement imposed time constraints on these latter provisions, it is undisputed that these constraints likewise resulted from sophisticated business negotiations. In short, the circumstances that compelled both the reasoning and the outcome in *Jewelers Mutual* do not apply to this case.

## B. Enforcing the TransAmerican–UOP Agreement

Orion did not meet its burden to establish its claim that the exculpatory and limiting provisions of the TransAmerican–UOP agreement are unenforceable. *See Willmott*, 2006 WL 3743716 at *8; *Reuben H. Donnelley Corp.*, 169 Ill.Dec. 521, 592 N.E.2d at 11.

Having been negotiated between two "sophisticated commercial enterprises," *see Vigortone*, 316 F.3d at 645, and *McClure Engineering*, 69 Ill.Dec. 183, 447 N.E.2d at 403, the TransAmerican–UOP agreement afforded two remedies for a perceived breach or other challenge to TransAmerican, Orion's predecessor-in-interest. The first remedy appears in article 7 of the main portion of the agreement. Article 7.1 contains UOP's express, three-year engineering warranty, to perform according to accepted engineering practices. It is undisputed that before Orion purchased TransAmerican's assets in 1998, TransAmerican had not asserted a claim for breach of the engineering warranty within the three-year period stated in article 7.1, which expired on May 1, 1998. Accordingly, the engineering warranty remedy expired on its own terms.

The second remedy provided by the agreement, the performance test contemplated by the performance guarantee in article I, paragraph 1.1 of Attachment V, is outlined and described fully above. These extensively detailed remedies provided for redesign or re-engineering of the unit, or both, under the conditions stated in the TransAmerican–UOP agreement. Based on the May 1, 1995 origin date of the

agreement, the deadline for any performance test under paragraph 1.1 of the performance guarantee, was May 1, 1998. Because the unit was not completely built by then, and construction had not even begun until 1997, it is undisputed that the condition imposed by article 1.2(b) of the Performance Guarantee in Attachment V could not be met. The performance guarantee, too, thus expired under its own terms without TransAmerican's having exercised any right to enforce it.[19]

UOP moved for summary judgment on Orion's breach-of-contract claim on the grounds that the engineering warranty and the performance guarantee had expired. UOP also relied on the following provisions of the agreement: (1) article 7.2's uppercased and bold-faced disclaimer of any other "warranties or guarantees, express or implied," (2) article 7.5's disclaimer of liability for "special, consequential[,] or indirect damages, including, but not limited to loss of profits or use," and (3) article 7.7's limitation on UOP's aggregate liability to $1.4 million. Orion challenges the summary judgment by claiming that the time limits and the disclaimers render the agreement a nullity.

The summary judgment record and the law bar Orion from avoiding the consequences of TransAmerican's failure to enforce the guaranty and performance terms that TransAmerican had negotiated by claiming that those terms rendered the agreement unenforceable. Nothing in the summary judgment record raises a fact issue to support that inference. Given the breadth of the provisions of the engineering warranty, to comply with accepted engineering practices, and the specificity of the provisions of the performance guaran-

tee, as negotiated by TransAmerican and extended in its favor by UOP, we cannot say that UOP's disclaimer, in article 7.2, of any other "warranties or guarantees, express or implied" renders the agreement an unenforceable nullity. Likewise, we cannot say that the negotiated disclaimer of liability in article 7.5, for "special, consequential[,] or indirect damages, including, but not limited to loss of profits or loss of use" or article 7.7's limitation on UOP's aggregate liability to $1.4 million, render the agreement an unenforceable nullity.

In contrast to the terms of the box-rental contract in *Jewelers Mutual*, which passed *all* risks to the box renters, the limitation in article 7.5 applies only to the damages specified in article 7.5 and thus merely limits damages without precluding liability. *See Willmott*, 2006 WL 3743716, *8–9 (citing *Jewelers Mut.*, 289 Ill.Dec. 635, 820 N.E.2d at 414–15). The same provision, article 7.5, also recognizes potential liability for property damage or property damage caused by UOP's "willful misconduct or negligence." Similarly, article 7.7 creates an exception to the $1.4 million ceiling for breach of the agreement's engineering warranty, to perform according to accepted engineering practices.

We conclude that the agreement validly forecloses Orion's successor claims for breach of contract, and that the trial court properly rendered summary judgment in favor of UOP on that cause of action.

We overrule the portion of the fourth issue in which Orion contends that its claims for breach of the TransAmerican–UOP agreement remain viable, despite the terms of that agreement.

**19.** It is undisputed that construction was delayed by the financial difficulties that resulted in foreclosure by TransAmerican's creditors and its ultimate bankruptcy filing. We note that no summary judgment evidence shows or suggests that TransAmerican attempted to renegotiate the agreement in order to extend the May 1, 1998 expiration date of either the engineering warranty or the performance guarantee.

### Extra–Contractual, Common–Law Causes of Action

In its second issue, Orion contends that it was entitled to pursue its extra-contractual claims, and that the trial court erred by rendering summary judgment in favor of UOP on those claims. Orion's extra-contractual claims include fraudulent inducement to contract, fraudulent misrepresentation, and fraudulent promise. Through these claims, Orion contends that it is entitled to seek damages from UOP despite the remedies under the Trans-American–UOP having expired, because UOP procured the agreement by fraud, whether by fraudulent inducement, fraudulent misrepresentation, or fraudulent promise.

### A. Illinois Limitations on Recovery for Fraud

Recovery for fraud is subject to several limitations in Illinois. We address those pertinent to this case below.

#### 1. *Fraud is Not an Alternative Remedy for Failed Contract Claims*

 Illinois law proscribes recovery in tort "for what is essentially a breach of contract." *Johnson v. George J. Ball, Inc.*, 248 Ill.App.3d 859, 187 Ill.Dec. 634, 617 N.E.2d 1355, 1361 (1993). Accordingly, when the terms of a contract bar a suit for breach, as we have just ruled above, a party to the contract cannot circumvent that bar by seeking recovery for fraud as an alternative remedy. *See id.*

#### 2. *No Recovery for "Promissory Fraud"*

 Orion's pleadings include claims for "fraudulent promise." Most jurisdictions permit a plaintiff to recover in fraud for "a promise made without the intent to perform," on the grounds that a misrepresentation of intent to perform constitutes the existing, material misrepresentation that is the predicate to a fraud

claim. *See Bank Computer Network Corp. v. Continental Ill. Nat'l Bank & Trust Co.*, 110 Ill.App.3d 492, 66 Ill.Dec. 160, 442 N.E.2d 586, 593, (1982) (quoting Prosser, Law of Torts § 109 at 729 (4th ed.1971)). Illinois courts reject this majority rule. *See id.* (citing *Vance Pearson, Inc. v. Alexander*, 86 Ill.App.3d 1105, 42 Ill.Dec. 204, 408 N.E.2d 782, 786 (1980)). "[M]isrepresentations of intention to perform *future* conduct, even if made without a present intention to perform, do not generally constitute fraud"; fraud requires a misrepresentation of an "existing" fact. *HPI Health Care Servs. Inc. v. Mt. Vernon Hosp., Inc.*, 131 Ill.2d 145, 137 Ill.Dec. 19, 545 N.E.2d 672, 682 (1989) (emphasis added). An Illinois claimant may not, therefore, recover in fraud by claiming that a party to a contract misrepresented his personal present intent, or the intent of another, to perform a promise in the future. *See id.; Miller v. Sutliff*, 241 Ill. 521, 89 N.E. 651, 652 (1909).

 As applied to this case, the Illinois bar to a claim of promissory fraud means that Orion may not rely on statements in the agreement that relate to future intent or conduct as substantive evidence to raise a material issue of fact in support of Orion's fraud claims. *See HPI Health Care Servs.*, 137 Ill.Dec. 19, 545 N.E.2d at 682; *Steinberg v. Chicago Med. School*, 69 Ill.2d 320, 13 Ill.Dec. 699, 371 N.E.2d 634, 641 (1977). As stated in the TransAmerican–UOP agreement, these are to be remedied solely pursuant to the engineering warranty and performance-guarantee provisions. Similarly, Orion cannot support its fraud claim by contending that UOP never intended to perform its engineering warranty, to conform to accepted engineering practices. For statements by UOP concerning future intent or conduct, Illinois law compels that Orion's only remedy was by an action on the contract and not by a fraud claim. As we concluded above,

though initially contemplated by the agreement, all contract claims based on the agreement have expired under the terms of the agreement and are no longer available.

An exception to the prohibition against recovery for promissory fraud can arise when the defendant's false promise or misrepresentation of intent or of future conduct is part of a "scheme to defraud" through false promises, in which case statements of future intent may be actionable. *See HPI Health Care Servs.*, 137 Ill.Dec. 19, 545 N.E.2d at 682; *Roda v. Berko*, 401 Ill. 335, 81 N.E.2d 912, 915 (1948); *see also Steinberg*, 13 Ill.Dec. 699, 371 N.E.2d at 641 (approving class action for medical students alleging fraudulent scheme of medical-school admissions); *Desnick v. ABC, Inc.*, 44 F.3d 1345, 1354 (7th Cir.1995) ("Our best interpretation [of Illinois law] is that promissory fraud is actionable only if it either is particularly egregious or, what may amount to the same thing, it is embedded in a larger pattern of deceptions or enticements that reasonably induces reliance and against which the law ought to provide a remedy.").

Orion's pleadings do not refer specifically to the Illinois "scheme to defraud" exception, but Orion relies on internal communications among UOP employees pertaining to the CEPOC facility, in particular, yields indicating a "substantial debit" from that facility, to support its contention that UOP was aware of defects in the MSCC process.[20] To any extent that Orion may have attempted to invoke the exception by relying on those communications, they do not raise a material issue of fact to show that UOP's conduct as to CEPOC was part of a scheme to defraud Orion's predecessor, TransAmerican. There is no evidence that the internal communications concerning the CEPOC facility also pertained to the Norco facility or that any of those communications were either made or disclosed to TransAmerican before the May 1, 1995 onset date of the agreement or before that date. *See HPI Health Care*, 137 Ill.Dec. 19, 545 N.E.2d at 682; *Bradley Real Estate Trust v. Dolan Assoc., Ltd.*, 266 Ill.App.3d 709, 203 Ill. Dec. 582, 640 N.E.2d 9, 12–13 (1994). Furthermore, Orion has consistently taken the position that its Norco facility, though similar to the CEPOC facility, differs from that facility and is "unique." Because it is undisputed that the facilities differ, UOP's internal communications referring to technical problems with the CEPOC unit raise

---

**20.** An internal e-mail from UOP's Larry Upson on April 13, 1995 concerns the CEPOC facility in New Jersey. Upson states that, on reviewing an MSCC report by another individual, he "realized that [he] had erred" in an earlier comparison of "actual CEPOC MSCC data" and "predicted results for a current day UOP riser at the same operating and feed conditions" and had "redone the comparison." Upson then reported that

This new apples v. apples comparison now makes the MSCC results look considerably less attractive. These data would indicate a substantial debit for gasoline yield, conversion, and bottom cracking for MSCC. MSCC still appears to have a dry gas advantage, although the advantage is now much smaller.

Since the data in this comparison comes from the period prior to the improvement in CEPOC's material balance, a similar evaluation of the more recent data may provide a different view of MSCC capabilities. I'll try to provide a comparison in the near future.

Despite reporting a "substantial debit," Upson's e-mail addresses implementation of the MSCC process at the CEPOC unit, which Orion has consistently described as a "different" facility. Upson's e-mail is no evidence of the MSCC process at the TransAmerican Norco unit. Moreover, Upson's e-mail clearly encompasses variables at the CEPOC facility, for example, the recent "improvement in CEPOC's material balance," which, Upson envisions, could produce a different comparison.

no material issues of fact that tend to show that UOP's allegedly false promises to TransAmerican were part of a scheme to defraud.

### 3. *Misrepresentations Must Refer to Present or Pre–Existing Facts*

Because statements of future intent or conduct are not actionable as fraudulent misrepresentations in Illinois and must be remedied through an action on the contract, a claim of fraudulent misrepresentation can derive only from "statements of present or preexisting facts." *See Bradley Real Estate Trust,* 203 Ill. Dec. 582, 640 N.E.2d at 12–13; *see also HPI Health Care Servs.,* 137 Ill.Dec. 19, 545 N.E.2d at 682 (stating that fraud requires a misrepresentation of an existing fact).

Orion grounds its claims of fraudulent misrepresentation on the TransAmerican–UOP agreement signed on May 1, 1995. Because fraud requires a misrepresentation of an existing fact, *HPI Health Care Servs.,* 137 Ill.Dec. 19, 545 N.E.2d at 682, to defeat UOP's motion for summary judgment, Orion had to present competent summary-judgment evidence of statements, actions, or conduct by UOP that occurred on or before May 1, 1995, the onset date of the agreement date. Therefore, we do not consider evidence on which Orion relied in the trial court and in this Court that relates to statements by UOP after the May 1, 1995 onset date of the TransAmerican–UOP agreement.

### B. Misrepresentation as Fraud

To be actionable as fraud in Illinois, a "misrepresentation" must contain the following elements:

(1) it must be a statement of material fact, as opposed to opinion;

(2) it must be untrue;

(3) the party making the statement must know or believe it to be untrue;

(4) the person to whom the statement is made must believe and rely on it, and have a right to do so;

(5) it must have been made for the purpose of inducing the other party to act; and

(6) the reliance by the person or entity to whom the statement is made must lead to the claimed injury.

*See Mother Earth, Ltd. v. Strawberry Camel, Ltd.,* 72 Ill.App.3d 37, 28 Ill.Dec. 226, 390 N.E.2d 393, 403 (1979) (citing *Broberg v. Mann,* 66 Ill.App.2d 134, 213 N.E.2d 89, 91–92 (1965))[21]; *see also W.W. Vincent,* 286 Ill.Dec. 734, 814 N.E.2d at 969 (holding that purchasing corporation stated valid claim of fraudulent misrepresentation by inducement, based on knowingly false statements, by transferring corporation, that assets transferred to purchasing corporation included general agents' contract).[22]

---

**21.** *Mother Earth* is considered the "seminal case" for analyzing fraud in Illinois. *Luciani v. Bestor,* 106 Ill.App.3d 878, 62 Ill.Dec. 501, 436 N.E.2d 251, 256 (1982); *cf., Soules v. General Motors Corp.,* 79 Ill.2d 282, 37 Ill. Dec. 597, 402 N.E.2d 599, 601 (1980) (stating, in context of claim of fraudulent misrepresentation, that plaintiff must show that defendant made a false statement of material fact, with either knowledge or belief that it was false and with intent to induce plaintiff to act, that plaintiff acted in reliance on truth of statement and suffered damage as result, and that plaintiff's reliance must have been specif-

ically justified by right to rely); *Barille v. Sears, Roebuck & Co.,* 289 Ill.App.3d 171, 224 Ill.Dec. 557, 682 N.E.2d 118, 122–23 (1995) (stating elements as (1) false statement of material fact, (2) known or believed to be false by party making it, (3) intent to induce other party to act, (4) action by other party in justifiable reliance on truth of statement, and (5) damage to other party from such reliance).

**22.** *W.W. Vincent* also held that the purchasing corporation stated a cause of action for fraudulent concealment because the transferring corporation had a duty to disclose that the assets transferred did not include the general

Orion's live pleadings allege that UOP's fraudulent misrepresentations about the MSCC process induced TransAmerican to enter into the agreement with UOP, and that TransAmerican relied on those misrepresentations. Specifically, Orion alleged that UOP misrepresented (1) that the MSCC process was superior to the former FCC process; (2) that the process was milli-second, when it was actually "multi"—second; and (3) that TransAmerican could expect specific yields on implementing the MSCC process. In moving for summary judgment on Orion's fraud claims, UOP argued, in part, that there was no reliance by TransAmerican beyond the terms of the agreement as a matter of law, because the agreement specifies that, "Except as specified in article 7 and in Attachment V, **UOP MAKES NO WARRANTIES OR GUARANTEES, EXPRESS OR IMPLIED.**" (Emphasis and upper case in original.)

Because the only promises made were those expressly stated in the agreement, which was the parties' "complete" agreement pursuant to article 13, which further disclaimed any other representations or agreements, UOP argued that Orion had

to establish the requisite element of reliance by its predecessor, TransAmerican.

### 1. MSCC as "Milli-Second"—Not A Fraudulent Misrepresentation

 We first address Orion's contention that UOP's fraudulent misrepresentations are apparent on the face of its agreement with TransAmerican and appear even in its title ("Milli-*Second* Catalytic Cracking™ (MSCC™) Process License, Engineering and Guarantee Agreement") (emphasis added). Orion contends that, because the MSCC process is not "*milli*"—second, as UOP allegedly promised, but actually "*multi*"—second in practice, the TransAmerican–UOP agreement "embodies the fraud," and that this misrepresentation constitutes actionable fraud on the face of the agreement. We disagree.

It is undisputed that the MSCC process constituted new technology; that the terms "MSCC" and "MSCC process" were proprietary and trademarked; that the process was patented; that the agreement incorporates the patent, as Orion has stipulated, and therefore, that the process was fully disclosed when TransAmerican and UOP entered into the agreement. Despite

agents' contract, as the transferring corporation had initially represented. *W.W. Vincent & Co. v. First Colony Life Ins. Co.*, 351 Ill. App.3d 752, 286 Ill.Dec. 734, 814 N.E.2d 960, 969–70 (2004). Orion has not specifically alleged a cause of action for fraudulent concealment, but does argue that UOP perpetrated an ongoing fraud by not disclosing to TransAmerican details concerning MSCC performance at the CEPOC facility.

But, neither the TransAmerican–UOP agreement nor Illinois law imposed a duty to disclose on UOP. With respect to the agreement, article 5.1, which addresses "Technical Information," does not impose a duty of disclosure, but, rather, provides that UOP's technical information would be "*available* to TransAmerican through UOP or its nominee," (emphasis added) and thus on request. Moreover, as the remaining provisions of article 5 demonstrate, this portion of the agreement

imposed a duty on TransAmerican and, therefore, Orion, not to disclose, but to safeguard the trademarked patent information conveyed by the agreement.

With respect to the common law, Illinois courts impose a duty to disclose only in the context of a special or fiduciary relationship, which this case does not involve. *See Neptuno Treuhand v. Arbor*, 295 Ill.App.3d 567, 229 Ill.Dec. 823, 692 N.E.2d 812, 817 (1998). The duty to disclose recognized in *W.W. Vincent* arose because of allegations that the transferring corporation had falsely misrepresented that the assets of the corporation included the general agents' contract and, therefore, income from the contract; because the assets did not actually include the general agents' contract, the transferring corporation had a duty to correct its fraudulent misrepresentation. *W.W. Vincent*, 286 Ill.Dec. 734, 814 N.E.2d at 969.

the appearance of the term "MSCC" in both title of the process and the title of the agreement, the summary judgment record demonstrates that neither the entire process, nor the residence time for hydrocarbons in the reactor, is described in terms of "milli"—seconds.

According to the patent, only the "reaction zone" time is stated in terms of less than seconds, specifically: "contact time in said reaction zone before passage into the separation zone being not greater than [a specified percentage of a second]."[23] Reaction-zone time, therefore, and not the entire process, is the only portion of this technology that is actually stated in terms of milli-seconds. Thus, the timing to which the title of the agreement refers was known at the time of the agreement. Because only reaction-zone time is described in terms of milli-seconds, evidence of other, longer-than-milli-second times is not evidence that gives rise to triable issues of material fact concerning UOP's alleged misrepresentations, given that UOP disclosed the reaction-zone time information at the time of the agreement.

### 2. *Remaining Alleged Misrepresentations—No Justifiable Reliance*

In opposing the motion for summary-judgment, in which UOP relied solely on the terms of its agreement with Trans-American, Orion claimed that it was entitled to recover for fraud—despite article 7.2's bold-faced disclaimer of any warranties, express or implied, article 13's "entire agreement" and disclaimer of other representations or agreements, and the remedies and performance guarantee provided by the agreement—because UOP's fraud had vitiated the TransAmerican–UOP agreement and rendered it unenforceable.

 Having rejected above Orion's claim that the agreement "embodies the fraud" by implying that the entire reactor process occurs in milli-seconds, we address Orion's remaining contentions, as follows: that UOP misrepresented the superiority of the MSCC process over the former FCC process and that TransAmerican could expect specific yields on implementing the MSCC process.

 To prevail on this claim under Illinois law, Orion had to establish that TransAmerican, its predecessor-in-interest, had justifiably relied on UOP's allegedly fraudulent misrepresentations. *See Barille*, 224 Ill.Dec. 557, 682 N.E.2d at 123; *Vigortone*, 316 F.3d at 645. In accordance with the well-settled general rule, reliance is not justifiable when the alleged victim of a fraud ignored or "closed his eyes to a known or obvious risk." *Vigortone*, 316 F.3d at 645 (citing *Mayer v. Spanel Int'l, Ltd.*, 51 F.3d 670, 676 (7th Cir.1995)); *see also Melko v. Dionisio*, 219 Ill.App.3d 1048, 162 Ill.Dec. 623, 580 N.E.2d 586, 592 (1991) (holding that duty of inquiry suspended only if reliance on representations was "reasonable") (citing with approval *AMPAT/Midwest, Inc. v. Ill. Tool Works, Inc.*, 896 F.2d 1035, 1041 (7th Cir.1990)). This requirement applies with particular force to transactions, like the one at issue in this case, that occur between "large, sophisticated commercial enterprise[s] with relevant experience." *See Vigortone*, 316 F.3d at 646.

To support its claim that UOP misrepresented the performance yields anticipated through the MSCC process, Orion relied on telecopier transmission to TransAmerican from Daniel Kauff of UOP, dated May 1, 1995, the onset date of the agreement. The five-page document consists of a cover sheet and four pages of tables provided to TransAmerican in response to its request during a meeting that occurred in the previous week. As reflected in the subject

---

**23.** Specified percentage omitted based on redaction and sealing order by trial court.

line for the transmission, however, the information consisted of "MSCC Yield *Estimates* for RCC Revamp" (emphasis added), and each of the four tables provided is labeled an "estimate." Furthermore, the cover sheet not only states that the estimate "is the basis for design, *except for* some aspects of the regenerator system," but also refers to additional design "to accommodate the maximum air rate" and "for higher coke burning capacity if possible." As estimates only, and estimates that contemplate as-yet-unaccomplished design development, as well as eventual performance testing in accordance with the agreement, the data conveyed to Trans-American on May 1, 1995 is no evidence that UOP knew that the estimates conveyed were false, and, therefore, is no evidence that UOP knowingly misrepresented the anticipated yields from the MSCC process at the Norco facility.

Orion also relies on an internal e-mail generated from Kauff that is dated May 5, 1995, and thus after the May 1, 1995 date of the TransAmerican–UOP agreement. Because the summary judgment record implies that UOP and TransAmerican engaged in continuing negotiations early in May 1995, despite the May 1 date recited as the onset date of the agreement, we consider this internal e-mail in determining whether Orion raised a material issue of fact concerning TransAmerican's reliance on allegedly knowing misrepresentation by UOP concerning the MSCC process at the Norco facility.

Kauff's e-mail reports two conversations with TransAmerican on May 5, 1995, and sets "[s]everal things" to be done on the following Monday by others at UOP because Kauff would be away from the office. The e-mail sets up a conference call to respond to TransAmerican's inquiries on the following Monday and states in part as follows:

Bill Byrne from Houston called with many questions on the yield estimate. When he added up the dollar value of *MSCC v. Brand K,* they were very similar. Further discussion indicates that MSCC gasoline and LPG are higher, but LCO is lower than Brand K. Since LCO price is nearly the same as gasoline and far higher than LPG, MSCC does not score any better on product value.

. . . .

The trickiest part of the conversation was concerning MSCC. Jack Stanley is convinced that MSCC gives +2 [XXXX [24]]. I was a witness to this misunderstanding when he and Dave B. were talking last week. Dave did lead him to believe this is true, by saying that with paraffinic feeds the [XXXX] was the same as with the automatic feeds, +2 for paraffinic feeds. Our estimate does not support +2 [XXXX] for TransAm and this is a problem. Chuck, can we control the damage?

Contrary to our belief that the project is in the bag, others around Stanley are still skeptical and asking tough questions. We need to keep on top of this over the next two weeks to stay on track.

In addition to referring to yield estimates, as opposed to fixed guarantees, Kauff's e-mail discloses "hard questions" by TransAmerican, a misunderstanding by Stanley concerning a UOP representative's reference to paraffinic feeds, "damage" to be controlled, and unfavorable comparisons with "Brand K" (UOP's competing bidder, which had not proposed an MSCC conversion). Neither Stanley's misunderstanding nor the skepticism and tough questions of those around him constitute actionable misrepresentations by UOP because they lack justifiable reliance. *See Barille,* 224 Ill.Dec. 557, 682 N.E.2d at

---

**24.** Rubric changed in accordance with trial court's sealing order.

123; *Vigortone,* 316 F.3d at 645. The agreement incorporates a performance test with specific yield targets, and the agreement disclaims any performance targets other than those stated in Article V. The summary judgment record does not disclose what measures UOP took to respond to TransAmerican's concerns, but TransAmerican's having voiced those concerns does not raise a fact issue concerning whether TransAmerican justifiably relied on UOP's alleged misrepresentations. *See Vigortone,* 316 F.3d at 645; *Melko,* 162 Ill.Dec. 623, 580 N.E.2d at 592 (addressing implications for justifiable reliance when logical and reasonable inquiries not pursued).

Any reliance by TransAmerican on either allegedly intentional misrepresentations of yields or allegedly false claims regarding the superiority of the MSCC process would not have been justified as a matter of law, given the terms of the agreement and the undertaking envisioned to construct a new facility, using technology that was undisputedly newly patented. This agreement, which resulted from negotiations between two sophisticated business enterprises, produced the following explicit provisions regarding those enterprises' understandings and their apportionment of risk: (1) article 7.1's express engineering warranty, to perform according to accepted engineering practices, and the corresponding remedy to reperform at UOP's expense; (2) Attachment V's express performance guarantee and its extensively detailed remedies; (3) article 7.2's express disclaimer that, except as provided by the two preceding provisions, **"UOP MAKES NO WARRANTIES OR GUARANTEES, EXPRESS OR IMPLIED;"** and (4) article 13's acknowledgment that the agreement not only "embod-ie[d] the entire understanding between the parties relating to the subject of th[e] agreement," but also disclaimed any "related prior representations or agreements." (Emphasis and upper case in original.)

The TransAmerican–UOP agreement explicitly provides for two express, though limited-in-time guarantees, one that applied to engineering practices and a second that applied to performance; and, in addition, the agreement explicitly disclaims any other warranties or guarantees, whether express or implied and any other representations. Accordingly, reliance by TransAmerican on any other representations by UOP, whether as to yields or superiority of the MSCC was unjustified.

As Judge Posner commented in *Vigortone,* there is no reason to set aside an agreement when the combined effect of its provisions and the circumstances of the case negate justifiable reliance as a matter of law. *See Vigortone,* 316 F.3d at 645.[25] This reasoning applies with particular force when, as here, the challenged agreement results from arm's-length negotiations between sophisticated commercial enterprises. *See id; accord McClure Engineering,* 69 Ill.Dec. 183, 447 N.E.2d at 403; *Hicks,* 306 Ill.Dec. 603, 858 N.E.2d at 54 (acknowledging Illinois public policy to enforce contractual appropriation and limitation of risks negotiated between business enterprises).

We hold that the TransAmerican–UOP agreement precludes the requisite element of justifiable reliance to support Orion's fraud claims and that Orion did not raise a fact issue on justifiable reliance through its summary judgment evidence. Because lack of justifiable reliance defeats Orion's fraud claims, we overrule Orion's second issue.

---

**25.** The disposition in *Vigortone* does not result from enforcing provisions of the contract construed in that case, but from analyzing the evidence, which negated justifiable reliance as a matter of law. *See* 316 F.3d at 645–46.

### Illinois Consumer Fraud and Deceptive Business Practices Act

 Orion's third issue challenges the summary judgment rendered on its claims asserted under the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILL. COMP. STAT. ANN. 505/2 (West 1998) (Consumer Fraud Act, or, the Act). UOP opposed Orion's late-filed amended pleadings invoking the Act in the trial court and also contended that it was entitled to summary judgment on that claim because Orion could not recover under the Act. We agree that summary judgment was proper. Pursuant to the Act,

> [U]nfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act" ... in the conduct of any

trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.

*Id.* Section 10(a) of the Act creates a remedy for persons who are damaged by conduct that constitutes a violation of the Act. 815 ILL. COMP. STAT. ANN. 505/10a(a) (West 1998). "The Consumer Fraud Act is a regulatory and remedial statute intended to protect consumers, borrowers, and business persons against fraud, unfair methods of competition, and other unfair and deceptive business practices." *Robinson v. Toyota Motor Credit Corp.*, 201 Ill.2d 403, 266 Ill.Dec. 879, 775 N.E.2d 951, 960 (2002). When the Act applies, it is to be liberally construed to effectuate its purpose. *Id.*[26]

 To prevail under the Act, a claimant must show "(1) a deceptive act or practice by the defendant; (2) the defendant's intent that the plaintiff rely on the deception; (3) the occurrence of the deception during a course of conduct involving trade or commerce; and (4) actual damage to the plaintiff (5) proximately caused by the deception." *Id.*; *Oliveira v. Amoco Oil Co.*, 201 Ill.2d 134, 267 Ill.Dec. 14, 776 N.E.2d 151, 160 (2002).[27]

26. The Act "protects consumers who purchase merchandise or home improvement services for their own use" and applies to both individual consumers and "relationships among business persons engaged in trade or commerce." *Barille*, 224 Ill.Dec. 557, 682 N.E.2d at 124. Though the Act was amended in 1990 to provide that " '[p]roof of a public injury, a pattern, or an effect on consumers generally shall not be required,' " Illinois case law continues to apply the general rule that "the Act does not apply to every commercial transaction regardless of the relationship between the parties." *Id.* (quoting 815 ILL. COMP. STAT. ANN. 505/10a (West 1994)). "[T]he relevant inquiry remains whether the alleged conduct involves trade practices addressed to the market generally or otherwise implicates consumer protection concerns." *Id.* Applying this inquiry in *Barille*, the Illinois appellate court stated that the Act does not apply

when there is no showing that the defendant's actions "affected competition, caused confusion to customers, influenced the market generally or otherwise implicated consumer[-]protection concerns." *Id.* There must be a showing of either (1) conduct that violates public policy or (2) oppressive conduct that leaves the consumer with little alternative but to submit. *See Robinson v. Toyota Motor Credit Corp.* 201 Ill.2d 403, 266 Ill.Dec. 879, 775 N.E.2d 951, 961, 963 (2002).

27. There must be a showing that the defendant intended that the plaintiff rely on the statement, but, in contrast to common-law fraud, the plaintiff need not establish its actual reliance on the statement. *See Oliveira v. Amoco Oil Co.*, 201 Ill.2d 134, 267 Ill.Dec. 14, 776 N.E.2d 151, 161 (2002); *Barille*, 224 Ill. Dec. 557, 682 N.E.2d at 124; *Martin v. Heinold Commodities, Inc.*, 163 Ill.2d 33, 205 Ill.Dec. 443, 643 N.E.2d 734, 754 (1994); *Sie-*

In addition, the Act is directed against conduct "affecting the people of [Illinois]," 815 Ill. Comp. Stat. Ann. 505/1(f) (West 1998); it has no "extraterritorial effect." *Avery v. State Farm Mut. Auto. Ins. Co.*, 216 Ill.2d 100, 296 Ill.Dec. 448, 835 N.E.2d 801, 852–53 (2005). A nonresident of Illinois may pursue a private cause of action under the Act, provided "the circumstances that relate to the disputed transaction occur primarily and substantially in Illinois." *Gridley v. State Farm Mut. Auto. Ins. Co.*, 217 Ill.2d 158, 298 Ill.Dec. 499, 840 N.E.2d 269, 274–75 (2005) (citing *Avery*, 296 Ill.Dec. 448, 835 N.E.2d at 853–54).

In *Avery*, an attempted class-action premised on claims that State Farm failed to pay for original equipment manufacturer parts, the Illinois Supreme Court held that the overwhelming majority of circumstances relating to the claims of the non-resident, Avery, occurred outside Illinois. *Avery*, 296 Ill.Dec. 448, 835 N.E.2d at 854. The circumstances that negated his claims included the following: Avery was a resident of Louisiana who kept his car in Louisiana; his accident occurred in Louisiana; the estimate for repairs to his car was written in Louisiana; the alleged deception, the failure to disclose the inferiority of nonoriginal equipment manufacturer parts, occurred in Louisiana; his car was repaired in Louisiana; and he contacted State Farm through a Louisiana agent, a Louisiana claims representative, and a Louisiana adjuster. *Id.* The Illinois Supreme Court applied a similar analysis in *Gridley*, in concluding that the Act did not apply to another Louisiana resident. *Gridley*, 298 Ill.Dec. 499, 840 N.E.2d at 275.

Orion contends that it may properly invoke the Act because UOP's home office is in Illinois, its alleged deceptions originated from Illinois, and the agreement with TransAmerican provides that it is to be governed by Illinois law. That the defendant has its headquarters in Illinois or that the plaintiff contends that the defendant's "scheme" emanated from Illinois does not suffice to invoke the Act. *Avery*, 296 Ill.Dec. 448, 835 N.E.2d at 855. The same reasoning defeats Orion's reliance on the contractual provision stating that Illinois law governs the agreement.[28] *See id.*

Orion and its predecessor, TransAmerican, are not Illinois residents, whom the Act is intended to benefit. *See* 815 Ill. Comp. Stat. Ann. 505/1(f). Though UOP generated communications from its home base in Illinois, these were directed to and transmitted to TransAmerican in Houston, Texas, concerning a Louisiana facility. Further, UOP made its sales presentations, and thus, any alleged misrepresentations, to TransAmerican in Houston, Texas. The circumstances of this case do not relate "primarily and substantially" to Illinois, but to a Delaware corporation, Orion, and its predecessor-in-interest, a former

gel v. Levy Org. Dev. Co., 153 Ill.2d 534, 180 Ill.Dec. 300, 607 N.E.2d 194, 198 (1992). The plaintiff must, however, establish that it was deceived in order to satisfy the statutory requirement of proximate cause. *Oliveira*, 267 Ill.Dec. 14, 776 N.E.2d at 163. Because the plaintiff may recover under the Act only if the alleged fraud proximately caused the claimed injury, *Martin*, 205 Ill.Dec. 443, 643 N.E.2d at 746–47, recovery must be premised on statements made *before* the transaction. *Connick v. Suzuki Motor Co.*, 174 Ill.2d 482, 221 Ill.Dec. 389, 675 N.E.2d 584, 594 (1996) (citing Ill. Comp. Stat. Ann. 505/2). Statements made after the transaction are not probative. *Id.*; *cf.*, *Rockford Mem. Hosp. v. Havrilesko*, 368 Ill.App.3d 115, 306 Ill.Dec. 611, 858 N.E.2d 56, 62–63 (2006) (stating that concealed fact must have been known to defendant when it was concealed).

28. Yet, Orion has also relied on Texas law, as we noted in addressing that we apply the Illinois law on which both parties relied in moving for summary judgment and responding to the motion.

Texas corporation, TransAmerican, concerning a facility in Louisiana, where all of UOP's work would be done.

We hold that Orion cannot recover under the Act because the alleged circumstances that relate to its claims did not occur "primarily and substantially in Illinois," as that phrase has been construed by the Illinois courts. *See Avery,* 296 Ill.Dec. 448, 835 N.E.2d at 853–54. Accordingly, the trial court properly rendered summary judgment on Orion's claims under the Act.

We overrule Orion's third issue.

### Economic–Loss Rule Bars Negligence Claims

In the portion of its fourth issue that we have not yet addressed, Orion challenges the summary judgment rendered on its negligence claims, on the grounds that these claims remained viable. Broadly construed, Orion's pleadings encompass general negligence claims and specific claims of negligent misrepresentation. UOP moved for summary judgment on the grounds that the economic-loss rule barred any negligence recovery.

### A. General Negligence Claims

Orion seeks damages as TransAmerican's successor as compensation for perceived losses derived from converting the Norco facility to the MSCC process, including the costs of building the facility.

 *Moorman Mfg. Co. v. Nat'l Tank Co.,* 91 Ill.2d 69, 61 Ill.Dec. 746, 435 N.E.2d 443, 450 (1982), prohibits recovery of economic loss in Illinois tort cases. *See First Midwest Bank, N.A. v. Stewart Title Guar. Co.,* 218 Ill.2d 326, 300 Ill.Dec. 69, 843 N.E.2d 327, 333–35 (2006) (characterizing *Moorman* as adopting the "economic loss rule" of most jurisdictions because "'contract law, which protects expectation interests, provides the proper standard when a qualitative defect is involved'")

(citing and quoting *Moorman,* 91 Ill.2d 69, 61 Ill.Dec. 746, 435 N.E.2d 443).

 "Economic loss" damages seek compensation for "inadequate value, costs of repair and replacement of the defective product, or consequent loss of profits—without any claim of personal injury or damage to other property." *Moorman,* 61 Ill.Dec. 746, 435 N.E.2d at 449. Economic loss for diminution in value occurs when a product is of inferior quality and does not work for the general purpose for which it was manufactured and sold. *See id.* To recover purely economic loss under a negligence theory, the complaining party must demonstrate harm that rises above and goes beyond diminished expectations. *See Mars, Inc. v. Heritage Bldrs.,* 327 Ill. App.3d 346, 261 Ill.Dec. 458, 763 N.E.2d 428, 434 (2002) (citing *Redarowicz v. Ohlendorf,* 92 Ill.2d 171, 65 Ill.Dec. 411, 441 N.E.2d 324, 327 (1982)). The limitation imposed by the economic-loss rule "holds true" even when, as here, the plaintiff is precluded from recovering on the contract. *Id.* (citing *Anderson Elec., Inc. v. Ledbetter Erection Corp.,* 115 Ill.2d 146, 104 Ill. Dec. 689, 503 N.E.2d 246, 249 (1986)).

 A party who seeks economic losses alone, but has incurred no other injury—whether to person or property—is generally precluded from recovery in tort. *See Bd. of Educ. v. A, C & S, Inc.,* 131 Ill.2d 428, 137 Ill.Dec. 635, 546 N.E.2d 580, 586 (1989). The distinction between recovery pursuant to a contract for economic loss and tort recovery for physical harm to person or other property generally depends on (1) the nature of the defect and (2) the manner in which the damage occurred. *Id.* In tort, the claimed defect results in either personal injury or property damage, and the manner in which the damage occurs is an accident involving some violence or collision with external objects. *Id.* Thus, tort remedies compen-

sate for losses occasioned by personal injuries or damage to one's property; contract law and the Illinois Uniform Commercial Code control damages derived from "diminished commercial expectations" that are not accompanied by injury to person or property. *In re Chicago Flood Litigation,* 176 Ill.2d 179, 223 Ill.Dec. 532, 680 N.E.2d 265, 275–76 (1997); *Moorman,* 61 Ill.Dec. 746, 435 N.E.2d at 450–53; *Mars, Inc.,* 261 Ill.Dec. 458, 763 N.E.2d at 434.

 Illinois recognizes three exceptions to the prohibition against seeking contract damages, i.e., economic-loss damages, in tort, as follows: (1) the plaintiff has sustained a personal injury or property damage as a result of a sudden or dangerous occurrence; (2) the plaintiff's damages are proximately caused by the defendant's intentional, false misrepresentation; or (3) the plaintiff's damages are proximately caused by a negligent misrepresentation made by a defendant in the business of supplying information for the guidance of others in their business transactions. *Trans States Airlines v. Pratt & Whitney Canada, Inc.,* 177 Ill.2d 21, 224 Ill.Dec. 484, 682 N.E.2d 45, 48 (1997); *Mars, Inc.,* 261 Ill.Dec. 458, 763 N.E.2d at 434. Injury to other property or personal injury nonetheless remains a threshold requirement. *A, C & S,* 137 Ill.Dec. 635, 546 N.E.2d at 586.

 The losses for which Orion has sued UOP in negligence are not compensable under Illinois law because there is neither personal injury claimed, nor damage to property other than the Norco facility. *See id.* To the contrary, Orion's claimed losses are purely economic losses, in the form of "diminished commercial expectations," and therefore not compensable in tort. *See In re Chicago Flood Litigation,* 223 Ill.Dec. 532, 680 N.E.2d at 275–76; *Moorman,* 61 Ill.Dec. 746, 435 N.E.2d at 450–53; *Mars, Inc.,* 261 Ill.Dec. 458, 763 N.E.2d at 434.

The trial properly rendered summary judgment in favor of UOP on the grounds that the economic-loss rule barred Orion's general negligence claim.

**B. Negligent Misrepresentation Claim**

Orion's claims of negligent misrepresentation invoke the third exception to the economic-loss rule. Like the general negligence claim, this claim fails at the threshold because Orion does not seek compensation for personal injury or damage to other property. *A, C & S,* 137 Ill.Dec. 635, 546 N.E.2d at 586. This claim also fails because it would not apply to UOP regardless, as we explain below.

 To state a claim for negligent misrepresentation, a plaintiff must allege: (1) a false statement of material fact; (2) carelessness or negligence in ascertaining the truth of the statement by the party making it; (3) an intention to induce the other party to act; (4) action by the other party in reliance on the truth of the statement; (5) damage to the other party resulting from such reliance; and (6) a duty on the party making the statement to communicate accurate information. *Id.* at 591; *Neptuno Treuhand v. Arbor,* 295 Ill. App.3d 567, 229 Ill.Dec. 823, 692 N.E.2d 812, 815 (1998). When, as here, the claimant seeks purely economic damages, Illinois law imposes a duty to avoid negligently conveying false information only if the defendant is in the business of supplying information for the guidance of others in their business transactions. *Brogan v. Mitchell Int'l, Inc.,* 181 Ill.2d 178, 229 Ill. Dec. 503, 692 N.E.2d 276, 278 (1998); *Moorman,* 61 Ill.Dec. 746, 435 N.E.2d at 452; *see also First Midwest Bank, N.A.,* 300 Ill.Dec. 69, 843 N.E.2d at 336 (holding that title insurer not in business of supplying information in issuing either title commitment or policy of title insurance, for purposes of exception to *Moorman* prohi-

bition against recovery of economic losses in tort; further holding that contract defines title insurer's liability).

Orion's negligent-misrepresentation claim fails because it is undisputed that the claim arises in the context of an agreement between two business entities and not from information provided to guide persons in their business transactions. *See First Midwest Bank, N.A.*, 300 Ill.Dec. 69, 843 N.E.2d at 336. Accordingly, the economic-loss rule applies under Illinois law. UOP was entitled to prevail by summary judgment on its contention that the economic-loss rule barred recovery.

We overrule the remaining portion of Orion's fourth issue.

### Petition–in–Intervention by Stanley

#### A. Standard of Review

Stanley brings a single issue, in which he contends that the trial court abused its discretion by striking his petition-in-intervention in response to UOP's motion. *See In re Lumbermens Mut. Cas. Co.*, 184 S.W.3d 718, 722 (Tex.2006) (applying abuse-of-discretion standard governing trial-court rulings on petitions to intervene on appeal); *Univ. Sav. Ass'n v. Intercontinental Consol. Cos.*, 751 S.W.2d 657, 662 (Tex.App.-Houston [1st Dist.] 1988), *aff'd sub nom., Guar. Fed. Sav. Bank v. Horseshoe Operating Co.*, 793 S.W.2d 652 (Tex. 1990); *Tony's Tortilla Factory, Inc. v. First Bank*, 857 S.W.2d 580, 589 (Tex. App.-Houston [1st Dist.] 1993), *rev'd on other grounds*, 877 S.W.2d 285 (Tex.1994).

▮ Rule 60 of the Rules of Civil Procedure permits a party to intervene in a pending lawsuit "subject to being stricken out by the court for sufficient cause on the motion of any party." Tex.R. Civ. P. 60. The burden is on the party who opposes intervention, here UOP. *See id.* A trial court abuses its discretion by striking a petition-in-intervention without a motion to strike having been filed when (1) the inter-

venor could have brought some or all of the same action in his own name, or, if the action had been brought against the intervenor, he could have defeated the action in whole or in part, (2) intervention will not complicate the case by excessive multiplication of the issues, and (3) intervention is almost essential to protect the intervenor's interest. *Guar. Fed. Sav. Bank v. Horseshoe Operating Co.*, 793 S.W.2d 652, 657 (Tex.1990); *Tony's Tortilla Factory*, 857 S.W.2d at 589.

#### B. No Abuse of Discretion

▮ Stanley, former chief executive officer of the now dissolved TransAmerican, sought to intervene to sue UOP for damages for the loss of his investment in TransAmerican. Stanley cannot satisfy the first element of *Guarantee Federal Savings* test because he could not bring an independent action against UOP.

Stanley was not a party to the agreement in any individual capacity. It is undisputed that TransAmerican's successor, Orion, became the owner of Stanley's former company when TransAmerican transferred its assets to Orion. These assets necessarily included any cause of action owned by TransAmerican relating to property, and, therefore, any cause of action relating to the Norco facility. *See White v. Independence Bank, N.A.*, 794 S.W.2d 895, 897 (Tex.App.-Houston [1st Dist.] 1990, writ denied) (holding that claims of corporation vest in corporation). As a result of the transfer, any rights that TransAmerican had against UOP vested in Orion.

As a shareholder of TransAmerican, Stanley could not have sued in his own name and for his benefit, even if he were injured in his status as a shareholder before the company's assets were transferred to Orion. *See El T Mexican Rests., Inc. v. Bacon*, 921 S.W.2d 247, 251 (Tex.App.-

Houston [1st Dist.] 1995, writ denied); *Kenneth H. Hughes Interests, Inc. v. Westrup,* 879 S.W.2d 229, 235 (Tex.App.-Houston [1st Dist.] 1994, writ denied). In *Kenneth H. Hughes Interests,* this Court rejected a similar claim by a corporate officer and shareholder who sued, individually, for loss of investment in a company, reasoning that permitting only the company to sue permits the company to be made whole, which, in turn, benefits the shareholder. *See id.,* 879 S.W.2d at 235. Stanley alleges no cause of action that is independent of his shareholder status.

Because Stanley, as a shareholder, could not bring his suit independently, the trial court did not abuse its discretion by denying his plea-in-intervention.

We overrule Stanley's sole issue.

### Conclusion

We affirm the judgment of the trial court.